Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Wayne R. Andersen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 6496 | **DATE** | 8/11/2004 |
| **CASE TITLE** | Edward F. Altman vs. City of Chicago | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter MEMORANDUM, OPINION AND ORDER: We grant the motion of defendant City of Chicago for summary judgment [63-1] pursuant to FRCP 56. Judgment is entered in favor of the defendant and this case is hereby terminated. This is a final and appealable order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | Document Number |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | AUG 1 2 2004 date docketed | |
| | Notified counsel by telephone. | | | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | 83 |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT CLERK | | |
| TSA | courtroom deputy's initials | 2004 AUG 12 AM 8:06 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EDWARD F. ALTMAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 99 C 6496 |
| v. ) | |
| ) | Judge Wayne R. Andersen |
| CITY OF CHICAGO, ) | |
| ) | |
| Defendant. ) | |

**DOCKETED**

AUG 1 2 2004

## MEMORANDUM OPINION AND ORDER

This case is before the Court on the motion of the defendant, the City of Chicago ("City"), for summary judgment pursuant to Fed.R.Civ.P. 56. For the following reasons, we grant the motion for summary judgment.

### BACKGROUND

The plaintiff, Edward F. Altman, began working for the City in 1975 as an Emergency Medical Technician for the Chicago Fire Department ("CFD"). In 1986, Altman accepted the position of Special Investigator in the CFD's Internal Affairs Division ("IAD"). In 1988, Altman became a Supervising Investigator, a position for which he obtained career service status. In 1993, Altman voluntarily took a leave of absence from his career service position to accept an appointment to the exempt and non-career service position of IAD Director. In 1993, after Altman accepted the non-career service position of IAD Director, the then vacant position of Supervising Investigator, previously held by Altman, was eliminated.

The City maintains that Altman was discharged from his exempt position of IAD Director for failing to take appropriate steps to report and investigate a videotape of a 1990 retirement

83

party held at a CFD fire house. The videotape apparently depicted CFD members consuming alcohol in a firehouse, going on a run to a potential fire scene after consuming alcohol at the party, making racially derogatory comments and exposing themselves. The release of this videotape drew both local and national media attention.

Altman claims that he was informed of the videotape in May 1997, by IAD Administrative Assistant, Mark Edinburg. Altman claims that upon learning of the tape, he instructed Edinburg to obtain a copy from Ezra McCann, the Fire Captain of Engine Co. 100, but that McCann refused to turn over the tape to Edinburg. According to Altman, he also informed Chief Connolly, head of labor and discipline for the CFD, about the existence of the tape in June, 1997, and that Connolly told Altman to get a copy of the tape. Altman claims that he informed his father, Fire Commissioner Edward Altman, of the tape's existence in July 1997, and that McCann stated he would give the tape only to Commissioner Altman. Altman further claims that he set up a meeting between McCann and Commissioner Altman on July 18, 1997 but that McCann did not tender the tape to Commissioner Altman at that time. Altman personally viewed the tape with McCann on July 23, 1997 and claims that he asked for a copy, but that McCann reiterated that he would give a copy only to Commissioner Altman. McCann failed to appear at a meeting with Commissioner Altman scheduled for July 29, 1997. According to Altman, he did not have the authority to directly order McCann to turn over the tape.

Altman claims that McCann gave a copy of the videotape to Channel 2 (WBBM), and that Altman was informed of this fact on or around November 20, 1997. On November 21, Altman and Edinburg met with Commissioner Altman, who informed the Mayor's office of the videotape's existence. In late November, 1997, the City's Law Department initiated an

investigation into the conduct depicted on the videotape, as well as the subsequent actions taken by the CFD. Altman claims that the Mayor directed the Law Department to take over this investigation from the CFD. McCann gave a copy of the videotape to the City's Law Department in late November, 1997, soon after the Law Department had initiated its investigation.

On December 3 and 4, 1997, the news media exposed the videotape and its contents, creating a flurry of negative local and national media attention. On December 8, 1997, Commissioner Altman removed Altman from his position as IAD Director and reassigned him to Personnel. On February 10, 1998, Patrick Kehoe, the First Deputy Fire Commissioner, presented Altman with written charges which had grown out of the Law Department's investigation. On February 11, 1998, Glenn Carr, the Commissioner of Personnel, informed Chief Kehoe that he had reviewed the charges against Altman and that the disciplinary process could be initiated. Altman was given a chance to respond to the charges, and he did so in writing on February 14, 1998. On February 25, 1998, Chief Kehoe informed Altman that he was going to be discharged from the position of IAD Director, effective February 27, 1998. Altman submitted his resignation letter on February 27, 1998, though he claims that the letter was drafted for him by Commissioner Altman.

After his removal from the IAD Director position, Altman requested to be placed on a reinstatement list for his former career service position of Supervising Investigator. The City's Personnel Rules provide that a career service member on leave and employed in an exempt capacity seeking to return to career service grade will be placed on a reinstatement list. Altman contends that the CFD has a custom or policy of disregarding the Personnel Rules and, instead, returning exempt employees directly to their career service grade or equal level. On March 30,

3

1998, the Department of Personnel agreed to place Altman on the reinstatement list, but advised him that his former position of Supervising Investigator had been eliminated from career service in 1993 and that reinstatement lists are not utilized for non-career service appointments. After twelve months, Altman was removed from the reinstatement list, as per the Personnel Rules. At that time, Altman was considered to be no longer employed by the City and not eligible for reinstatement to any other position.

In 1999, Altman filed a three-count complaint against the City pursuant to 42 U.S.C. § 1983. Count I alleges that the City deprived Altman of a property and liberty interest in his continued employment with the City without being afforded procedural due process. Count II alleges a denial of substantive due process based upon violations of Altman's property and liberty interests. Count III alleges that Altman was denied equal protection because, unlike other similarly situated employees, he did not receive a career service appointment when he lost his exempt position.

## DISCUSSION

Summary judgment will be granted when "the pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court will not render summary judgment if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The mere possibility of a factual dispute is not enough to defeat a summary judgment motion. Id. at 250; *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

## I. Altman Has No Evidence That He Was Denied Due Process

Before Altman may assert a due process claim, be it procedural or substantive, he must establish that he has a "legitimate claim of entitlement" to the right being asserted. *Harris v. City of Auburn*, 27 F.3d 1284, 1285-86 (7th Cir. 1994) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)). In Counts I and II, Altman asserts deprivations of procedural and substantive due process based upon his claims of violations of his property and liberty interests. However, since Altman cannot prove that he was deprived of either a property or liberty interest, both his due process claims must fail.

### A. Altman Cannot Establish A Deprivation of Property Interest

First, Altman's due process claim fails because he cannot establish that he was deprived of a property interest in continued employment with the City. "Property interests are not created by the Constitution . . . [r]ather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents*, 408 U.S. at 577. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it . . . [h]e must have more than a unilateral expectation of it." Id. Here, there is no dispute that Altman has no property interest in his continued employment in his at–will position of IAD Director. The City's Personnel Rules provide that an at-will employee "may be disciplined or discharged at any time for any reason or no reason and have no expectation of continued employment." City of Chicago Personnel Rule XVIIIA. Furthermore, an at-will employee does not have a constitutionally protected property right in his continued employment. *See, e.g., Campbell v. City of Champaign*, 940 F.2d 1111,

1112 (7th Cir. 1991); *McMillian v. Svetanoff*, 878 F.2d 186, 191-92 (7th Cir. 1989). Thus, Altman cannot establish that he had a property interest in his continued employment as IAD Director.

Altman attempts to establish that he has a property interest in being returned to his former career service position of Supervising Investigator, or to a position of equal level grade. Again, there is no dispute that the City's Personnel Rules, alone, do not give Altman any claim to entitlement in his previous career service position. The City's Personnel Rule XI, Section 1(b) provides in part:

> An employee seeking return from a leave for appointment or election to another City office or position will be reinstated to a position in the same class as the position formerly held, if such position exists, is vacant and the department head wishes to fill it . . . . If no vacancy exists as described, the employee's name shall be placed on the appropriate Reinstatement list.

Here, Altman's former career service position was eliminated in 1993. Accordingly, Altman was placed on the appropriate Reinstatement list pursuant to the City's Personnel Rules.

However, a property right in employment can also arise from an unwritten common law established through rules or mutually explicit understandings. *Lawshe v. Simpson*, 16 F.3d 1475, 1480 (7th Cir. 1994) (citing *Perry v. Sindermann*, 408 U.S. 593, 602 (1972)). In this case, Altman attempts to establish that the CFD had a custom or practice of returning exempt employees to their former career service or equal level grade, thus creating a property interest in their continued employment. In support of his position, Altman offers a list of CFD employees who allegedly have been returned to their career service positions without being placed on a reinstatement list. Altman also offers three specific examples of CFD employees in exempt positions who were placed back into career service positions. However, none of this material

6

proves that Altman and the City had a mutually explicit understanding that the CFD had a custom or practice of not following its Personnel Rules.

Altman first offers a list of over twenty CFD employees whom he claims were returned directly from exempt positions to career service positions without being placed on reinstatement lists. However, the City's Personnel Rules provide that an employee seeking return from an exempt position will be reinstated to a career service position "if such position exists, is vacant and the department head wishes to fill it." City of Chicago Personnel Rule XI, Section 1(b). Here, Altman has not offered any evidence that, like Altman's case, there were no vacancies for these employees when they were removed from their exempt positions. Thus, the list does not support Altman's contention and is not admissible as evidence that the City did not follow its Personnel Rules.

Altman also offers the example of Richie Schultz, whom Altman claims was removed from an exempt position and returned to career service. However, the only support Altman offers for this assertion is Altman's own testimony. This is hearsay and also inadmissible as evidence of a custom or practice.

Altman's next example is Deputy Fire Commissioner Donald Stensland, whom Altman claims received chief's pay while working in the maintenance department until a spot could be worked into the budget. However, Chief's Stensland's situation is distinguishable from the present case. Chief Stensland was forced to retire from his at-will position at age 63. Subsequently, he filed a charge of discrimination with the Equal Employment Opportunity Commission against the City, claiming that he was improperly subject to the City's mandatory retirement age. The Seventh Circuit previously had ruled that the City had improperly applied

7

its mandatory retirement ordinance to CFD uniformed members holding exempt positions. *Roche v. City of Chicago*, 24 F.3d 882 (7th Cir. 1994). As part of Chief Stensland's settlement terms, he had to be reinstated. Since there was no vacant Deputy Fire Commissioner position, the City placed Chief Stensland in the only vacant line item in the budget, which was in the maintenance division. Thus, Chief Stensland's situation is clearly distinguishable from Altman's and is inadmissible as evidence of a custom or practice of the City.

Altman's final example is Robert Oden, whom Commissioner Altman testified was removed from an exempt position and returned to career service. However, Oden's former position still existed and was vacant when he was removed from his exempt position. As such, the City returned him to his former career service position as per the Personnel Rules. Thus, this example fails to provide any evidence that the City had a policy of not following its Personnel Rules.

What is most detrimental to Altman's argument is his status as an at-will employee. By accepting the at-will position of IAD Director, Altman relinquished certain benefits he would have had in a career service position. Altman does not dispute that the City's Personnel Rules provide that an at-will employee may be discharged for any reason or no reason at all, or that an employee returning from an exempt position will be placed on a reinstatement list if there is no vacant career service position. In this case, Altman accepted an at-will position and his former career service position was subsequently eliminated, leaving no vacancy after his discharge as IAD Director. The record is devoid of any admissible evidence that the City had a custom or practice of not following its own Personnel Rules. Thus, Altman fails to provide any evidence that he had anything more than a "unilateral expectation" that he would be returned to a career

8

service position.

   B. <u>Altman Cannot Establish A Deprivation of A Liberty Interest</u>

Altman's due process claim also fails because he cannot establish that the City deprived him of any liberty interest. To show a deprivation of a liberty interest, Altman must show that: 1) he was stigmatized by the defendants' conduct; 2) the stigmatizing information was publicly disclosed; and 3) he suffered tangible loss of other employment opportunities as a result of public disclosure. *Johnson v. Martin*, 943 F.2d 15, 16 (7th Cir. 1991) (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976)). However, "[l]iberty is not infringed by a label of incompetence or a failure to meet a specified level of management skills, which would only affect one's professional life and force one down a few notches in the professional hierarchy." *Simpkins v. Sandwich Community Hospital*, 854 F.2d 215, 218 (7th Cir. 1988) (quoting *Munson v. Friske*, 754 F.2d 683, 693 (7th Cir. 1985)).

Altman is unable to show he was deprived of his liberty interest since he cannot prove that the City publicly disclosed any stigmatizing information regarding his discharge. Altman claims he was unable to find employment because of statements the City made to the media tying him to a "cover-up." In support of his position, he offers evidence of newspaper articles and television transcripts allegedly showing false statements made by public officials. However, Altman cannot prove that any of the evidence he has offered rises to the level of stigma necessary to show a deprivation of a liberty interest.

Altman first offers several newspaper articles reporting the circumstances surrounding his discharge. In the first article, a source from the City's law department stated that they are recommending Altman's discharge because he "sat on" the videotape for nearly six months. In

9

the second article, the Mayor stated that Altman was fired for failing to investigate the videotape and inform his superiors. In a third article, Commissioner Altman stated that Altman was fired for not moving fast enough regarding the videotape. These statements are merely "labels of incompetence" or indications that Altman failed "to meet a specified level of management skills." *Id.* Thus, these articles fail to provide any support that the City publicly disclosed stigmatizing information regarding Altman's discharge.

Altman also offers another newspaper article reporting events surrounding the videotape in which City Alderman Robert Shaw stated "they tried to cover it up." However, Altman has not offered any evidence to indicate that Alderman Shaw was referring to Altman by using the word "they." Thus, this article also fails to provide any support for Altman's position.

Finally, Altman claims that City officials' statements depicted him as being dishonest, which can rise to the level of stigma. *See Munson*, 754 F.2d at 693. In support of this position, Altman points to two newspaper articles that report Altman's filing of the present lawsuit. In these articles, both the Mayor and the City's law department stated that Altman signed a statement that he never talked to Commissioner Altman about the videotape, contradicting Altman's allegations in this lawsuit. Aside from the fact that it was Altman's affirmative act of filing the lawsuit that led to these statements, we find Altman's argument that these articles publicly stigmatized him unpersuasive. As the Supreme Court has noted, since these communications were "made in the course of a judicial proceeding which did not commence until after [Altman] . . . had suffered the injury for which he seeks redress, [they] . . . surely cannot provide retroactive support for his claim." *Bishop v. Wood*, 426 U.S. 341, 348 (1976). Thus, Altman has failed to provide any admissible evidence that he was deprived of a liberty

interest in relation to his discharge.

Because Altman has offered no admissible evidence to show that he was deprived of either a property or liberty interest in relation to his discharge, both his procedural and substantive due process claims must fail. Therefore, we need not address the issue of whether Altman has met his burden to impose § 1983 liability on the City. Accordingly, we grant the City's motion for summary judgment as to counts I and II.

II. Altman Cannot Establish An Equal Protection Violation

Altman also asserts a "class of one" equal protection claim. The Supreme Court has "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Under Seventh Circuit precedent, Altman may also state a claim under the Equal Protection Clause if he can demonstrate "that the government is treating unequally those individuals who are prima facie identical in all relevant respects and that the cause of differential treatment is a 'totally illegitimate animus toward [Altman] by the [City].'" *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (citing *Olech v. Village of Willowbrook*, 160 F.3d 386, 388 (7th Cir. 1998), *aff'd on other grounds*, 528 U.S. at 565). Here, Altman attempts to establish that he was treated differently from other similarly situated employees who had knowledge of the videotape. However, Altman has failed to produce any evidence that there were similarly situated employees who were treated differently and that the City did not have a rational basis for discharging him.

First, because of Altman's status as an at-will employee, the City did not even need a

rational basis for removing him from his position as IAD Director. Under the City's Personnel Rules, an at-will employee may be "disciplined or discharged at any time for any reason or no reason . . . ." City of Chicago Personnel Rule XVIIIA. This alone is sufficient to defeat Altman's argument.

Altman attempts to get around this reasoning by arguing that even as an at-will employee he is still afforded Equal Protection Clause privileges and offers examples of other employees he considers similarly situated who were not disciplined. Specifically, he claims that District 6 Chief Joe Boatner, Commissioner Altman, Chief James Connolly, and Captain Ezra McCann all had knowledge of the videotape and were not disciplined. Although Altman is correct that the Equal Protection Clause applies to at-will employees, none of these people were similarly situated or prima facie identical to Altman. As IAD Director, Altman was in charge of the department whose main function was investigating wrongdoing and misconduct by CFD employees. While the other employees may have had the authority to investigate the videotape, the conduct of internal investigations was not their primary duty: this duty was given to Altman. Because there is no admissible evidence that these employees were "similarly situated" or "prima facie identical in all relevant respects to Altman," Altman cannot prove this element of an equal protection violation.

In addition, since internal investigations were central to Altman's position, the City's decision to discharge him for failing to conduct a proper investigation was made on a rational basis. Altman's removal from his position of IAD Director was in response to his failure to initiate an investigation or inform his superiors of the conduct depicted on the videotape. Regardless of whether Altman informed his superiors, the undisputed evidence indicates that

12

Altman did not initiate a formal investigation until after the media exposed the videotape. Thus, the City's decision to remove him from his position of IAD Director was clearly made on a rational basis. Altman has also failed to produce any evidence that the decision to discharge him was made with any "illegitimate animus." According, we grant the City's motion for summary judgment as to count III.

## CONCLUSION

For the foregoing reasons, we grant the motion of defendant City of Chicago for summary judgment pursuant to Fed.R.Civ.P. 56. Judgment is entered in favor of the defendant and this case is hereby terminated. This is a final and appealable order.

Wayne R. Andersen
United States District Judge

Dated: August 11, 2004